Our next case for argument is Davis v. Department of Corrections, case number 22-35109. Good morning. I represent Mr. Davis. I'm going to try to save eight minutes, if possible. Good luck. Thank you. So there's a lot of facts in this case, but I think the legal kind of common thread, a good place to start, would be page 35 of Dr. First's brief, where he uses a phrase, and that is dispositive testimony. I'd never heard it before. Neither has Westlaw, apparently. But it stands for the proposition that under the Eighth Amendment, you'll have a defendant who can be deliberately indifferent to serious medical needs or basic human needs, cause harm to an inmate, but nonetheless not be liable because of dispositive testimony. They need to offer dispositive testimony that says they did not perceive an excessive risk in their deliberate indifference to the serious needs of the inmate. Of course, that talks past the issue here because we don't have a case of risk here. Webster says risk is the potential for harm. We have a case of harm here, actual harm. Counsel, you have a whole bunch of different people who are different circumstances. Do you want to make sure that you identify which of the defendants you're talking about? Well, most specifically, the cross-move motions pertain to the first three in time. But the argument pervades all the defense briefing. There's a couple hundred pages. But you both moved for cross-summary judgment. Yes, so the first three defendants... So that suggests that both sides thought that this was appropriate for the district court to decide. Absolutely, yes. And so you certainly thought that all the facts were on your side. They thought that the facts all ran on their side. But bottom line is that both sides seemed to agree that there was no reason to go to trial on this. Yeah. Okay. Well, no, don't say on this because there's a van ride, there's... That's what I... Okay. Counsel, I preface this by saying if you want to identify which defendants you're talking about, it would be really helpful because they're very, very different circumstances. Right, so there's a timeline here, right? So the first prison was... Just tell me which defendants you want to hear. A new lawn would be... Okay, is that who you want to talk about as the nurse? Well, the new lawn, whole, and first have all asserted this risk argument. So with this many facts, I was trying to talk about a point of law that is consistent throughout the briefing. 140 times they used the term risk. And so when they do that, of course... So is your argument that you win or is it your argument that this has to go back for trial? Well, it should be remanded on trial for specifically the van ride incident, the damages. Okay, the van rides, that's not Newland Hall or Forrest. I'm really confused. Or first, I'm sorry, first. I'm really confused as to who you want to talk about. Well, it's tough when we have this many and I've got seven minutes. Right, counsel, but let's pick your battles. Who do you want to talk about? We have your briefing. So I've read the stuff. I've read the depositions. I've read the medical records. Who would you like to talk about? Okay, well, how about an easy one would be the two medical defendants because they're lumped together. They're both making an argument that they have contemplated in their professional judgment and contemplated and arrived at a medical choice to offer a course of non-treatment. And so those two both have, just like with the risk argument, they have overshot the actual issue. They've talked past the harm. So you're talking about Butts and Pollard? No, no. The medical defendants are Dr. First and N.P. Newland. Yes. And then, of course, a third layer of the way these folks have affirmed. So these are basically every ounce of briefing looks like an affirmative defense. It's all so what style briefing. That's what law professors like to call the affirmative defense. But there's no legal basis here because we don't have a risk of harm and we have no treatment. We don't have, you know, and they try to glom on to Dr. Chung from Toguchi and at best they're Dr. Penner from J.V. Penner. And Dr. Penner actually did some things that were sort of related to the harms there. But here we have nothing. We have nada. We have medical arguments from the defendants that their medical minds cogitated and arrived at the choice to provide nothing. So when they do that, just like when they talk about risk, they are saying so what without a legal basis. Counsel, that's belied by the record. Nurse Newlin saw your client on multiple occasions. Dr. First wrote up extensive notes. I have read these notes. That's not no treatment. Well, no, but those are, well, that's the same thing that Penner did. I mean, Dr. Penner did lots of doctory things, but nothing that would possibly result in any sort of. Right, but when you tell me that there's no treatment, that just simply is not true. Well, there's no medications, Dr. First. No medication for you. He may have decided that no medications were called for. There was a standing order. He referred him. That's right. It looks like there might have been some mistakes made here. But mistakes don't necessarily amount to an Eighth Amendment violation. Agreed. That may be a medical malpractice issue, but medical malpractice is not the same as Eighth Amendment. But it is after like five different kites and a whole bunch of e-mails from his colleagues who said, here comes this patient, and then Dr. Zeiger who said, hey, he's about to expire, and then immediately from day one, kites are coming in. And, you know, he heard it six ways to Sunday from everybody, this guy's off his meds. So, I mean, you know, we're talking about the Eighth Amendment. You want to talk about penological interests, right? We're talking about the Eighth Amendment. So what's the penological interest there, right? Just let felons and the general population off their mental health meds? Dr. First testified that's his policy. He does that no matter what. If there's a standing order, that's his personal policy. That's right there. His briefing argues that, and it's in his deposition. And Newland's the same way. She diagnosed the chronic pain issue, and she started out in advocacy for a new sleeping mat. She ignored his request for a job accommodation when she's the only one who could have provided it. You know, these are – you don't respond to a kite and then pretend you're negligent. You can't respond if you don't have subjective knowledge of the actual harm. Before you get to your seven-minute cutoff, I've got a specific question. In your ADA claim, you argue that the district court applied the wrong legal standard. Yes. What's the right legal standard? Because I didn't see it in your brief. It's just a straight reasonable accommodation claim, and that's – What's the legal standard that we are to apply on the ADA claim? Just whether the accommodation requested was reasonable. And, you know, the deposition of the department, which came like 600 days after the systemic issue report, was pretty eye-opening because it's almost like there isn't an ADA program. They have sort of this product-driven thing where, okay, if the ADA – Just so I'm clear. Okay. The standard we are to apply, in your mind, is was the ADA accommodation requested? Was that request reasonable? Yes. Okay. And there's a way that some courts use the by reason of disability stuff, and they try to fold that into the analysis. But that's – If we look at the – 19 years ago, this court cleared that up with McGarry. If someone doesn't have a reasonable accommodation that they should have, then that's the problem right there. It stops the analysis. It doesn't – You don't have to say, did they deny the accommodation by reason of his disability? I mean, that doesn't even – There's no logical way to do that. But that's what the district court found. I guess I'll reserve my time. Okay. Good morning, Your Honors. I'm Julie Turley on behalf of the DOC defendants. I will be arguing for eight minutes, and my co-counsel will be arguing for seven minutes. Every time Mr. Davis sought medical care, he received it. In fact, he ultimately received everything he complains of in this appeal, just not on the timeline that he wanted it. But his frustration with that timeline is not a violation of his civil rights. The DOC defendants ask that this court affirm all of the trial court's decisions, but this morning I will focus on Mr. Davis' Eighth Amendment claims. Mr. Davis cannot prove cruel and unusual punishment on this record. The law is clear that deliberate indifference requires a conscious disregard of a prisoner's needs. The Seventh Circuit has described this as something that approaches near total unconcern. There is no evidence that any of the DOC defendants intentionally ignored Mr. Davis' needs. In fact, it's exactly the opposite. I want to be clear. Are you also covering officers Pollard and Butts and the transport? Yes, Your Honor, to the extent that there's deliberate indifference. Can we focus there then? Because I think in your briefing, well, no, I'm sorry. I think in the district court's decision, the district court said that there was no evidence to support the claim. And I'm struggling with that because you had the plaintiff's testimony about what happened in that van, and why is that not cognizable evidence? Because there's no evidence that either Butts or Pollard subjectively knew and disregarded an excessive risk. First of all, none of the hospital staff reported that Mr. Davis was subject to any special needs before they transported him. And there's no, but furthermore, there's no evidence of causation there. That's where Mr. Davis' claim really falls apart. So we're on a motion to dismiss. No, we're not. Sorry, we're on summary judgment. Yes. We still have to view the facts in the light most favorable to the plaintiff on that issue, correct? Correct, Your Honor. And so my understanding of his testimony is I'm coming out of the hospital from neck surgery, and the officers would have known at least that, that he's coming out of the hospital and he just had surgery. I think he had visible staples in his neck, right? Yes. They bolt him to a wheelchair in the back of a van. And, again, his testimony is that he asked them to drive smoothly. I think the timing of that might be a little bit unclear, whether the drive had already started and it was rough, and he said, please drive smoothly, or if it was from the outset. But, again, he says, in response, the officers tell him to shut up, and then they proceed to drive crazy, jerking to a stop and making very rough turns. And then he vomits and he loses control of his bowels. So if we have to take all of that as true, I asked you to be smooth, and, in reaction, you did the opposite, knowing I just got out of the hospital and just had surgery. Why isn't that a triable question? First of all, the evidence is that he started vomiting actually before they even got on the freeway. And they pulled over to the side of the road and they gave him a vomit bag. But, again, there's no medical evidence to tie his vomiting to their driving. So in his testimony, he says that he was not nauseous when he got out of the hospital and got in that car, and that all of that happened in the van after the driving. Why can't we accept that for purposes? I mean, I think you want an expert to say, you know, driving is why he vomited. Why can't he say, I wasn't nauseous at all until this driving started happening, and have that be a triable question? Because there are multiple other reasons that he could have been nauseous or vomited in the car, including medication he took before the drive began, which is not disputed. I believe he took some pain medication, the fact that he was recovering from anesthesia. There are other options about why he could have been experiencing those effects. But there's also no evidence that the driver was intentionally driving that way. But if you take his version of it, isn't there? His testimony is, I asked you to be smooth, and in reaction, you got really rough. That's his perception, though, Your Honor. But that's evidence. And intent is usually a jury question. But his perception of the ride is not enough because, on summary judgment, he doesn't focus on the intentionality of the drivers. Subjective knowledge is not a question of fact because he didn't present any contrary evidence of what the DOC defendants actually knew or their consciousness or their intentionality of their reaction to his condition. None of which would be relevant to a negligence claim, which he also asserts against these same officers, true? That is true, Your Honor. But, again, that claim also falls on medical causation testimony. What is the obscure medical factors from a drive that requires a medical expert? Again, because there are other factors at play that could have caused him to vomit or to have those other side effects. Just his perception of the ride is not sufficient to survive summary judgment. Moving back to Ms. Newlin, as earlier pointed out, she had 11 encounters with Mr. Davis from the end of August through November 2018. She provided evaluations, prescriptions, med management, reviewed records, consults, and an MRI request, et cetera, all in those few months. She provided a lifting restriction to Mr. Davis the first time he asked for it, and it is not disputed that she could not write a health services request for a mattress. Mr. Davis can't prove deliberate indifference simply because he disagreed with the timeline or that he was not provided these things in the manner that he wanted them to. Evidence of Ms. Newlin's diagnosis or what she read also assumes conclusions, which cannot be made on summary judgment. There's simply no proof of her subjective or conscious disregard. The same is true for Mr. Hull. He did respond to Mr. Davis' request for a new mattress outlined in his declaration. He inspected the mattress while Mr. Davis was in Tier F. He inspected it again when Mr. Davis was moved to Tier A, and he was provided a mattress on the same day, and that time span was about three months. There is no evidence that Mr. Davis presents to rebut those facts. Mr. Davis testified, in fact, that all of the mattresses were bad at DOC and that DOC hadn't new mattresses and that they were being distributed. He just didn't get one when he wanted it. There is no evidence that Mr. Hull knew the severity of Mr. Davis' pain or that he did not respond reasonably, and his suggestion that Mr. Davis seek an HSR was not evidence that he knew of an excessive risk but providing him a possible avenue to address what he wanted. That was not conscious disregard at all. And unless the Court has any further questions, I would ask that summary judgment for the DOC defendants be affirmed because Mr. Davis cannot satisfy deliberate indifference for conscious disregard. Thank you. Good morning, Your Honors. I'm Amanda Thorsvig for Dr. Michael Furst. We're asking you to affirm the District Court's dismissal of the Eighth Amendment claims against Dr. Furst. And I'd like to talk today about Dr. Furst's words and his actions that demonstrate he was not deliberately indifferent to any serious medical need of Mr. Davis. Before I do that, I want to just briefly reflect on the standard. Courts have time and again emphasized that a deliberate indifference claim has to have a subjective component. Otherwise, you're looking at a medical negligence claim, which in this case is actually proceeding in state court, not the stringent standard for an Eighth Amendment violation that the Ninth Circuit and the Supreme Court have worked hard not to dilute. And under that subjective standard, a defendant has to actually know of and disregard an excessive risk to inmate health or safety. And here, Dr. Furst did neither of those things. In his words, quote, I did not think that Davis being on 50 milligrams of amitriptyline for 10 days and then having it stopped represented an urgent situation either medically or from a mental health perspective. And he explained that was because Mr. Davis had only been on a moderate dose of amitriptyline for a short period of time. Any withdrawal symptoms he might have had would have been mild. They would have resolved by the time Dr. Furst even saw the first kite. And he wasn't reporting any urgent medical or mental health needs. And that is conclusive testimony. And the plaintiff can't create an issue of fact just by arguing to the contrary in the face of that conclusive testimony. He's got an expert who says that to a medical certainty, the doctor should have investigated further and did not properly treat him. He does. First of all, two points with regard to that expert. The expert never says anywhere that Dr. Furst was deliberately indifferent to a serious medical need. She takes issue with his medical judgment. She raises a difference of opinion about what the best care possible might look like, the fastest care possible, notwithstanding practical considerations and needing to triage patients. And she's never worked in a jail setting, that expert. She's not familiar with the protocols. Does the standard of medical care depend on whether it's in a jail setting or not? The standard of medical care doesn't. And then we're looking at a malpractice claim, which, as I said before, is proceeding in state court. You have an ongoing proceeding involving Dr. Furst and Mr. Davis in state court. Yes, we do, in Washington State Court. And that is really what this case is about, is a difference of medical opinion. It is not about deliberate indifference to a serious medical need. Can a medical expert really opine on deliberate indifference? Isn't that more of a legal issue or a factual issue? It is a legal issue. But she doesn't take any kind of steps to establish that what Dr. Furst did would be obviously inadequate care. And you see that in some of the cases. For example, in Jett v. Penner, which counsel alluded to earlier, that was an example of obviously inadequate care. In that case, the inmate had a broken thumb. Everybody agreed you need to set a broken thumb in a certain amount of time. You've got to put a cast on it so that the bones align properly when they're fusing back together. And that wasn't done, not for any medical reason, but because the physician there just delayed and delayed to the point where then the bones had grown together improperly. He needed surgery to fix it, pins put in. Here, you don't have that kind of obviously inadequate care. There's no cookie-cutter way to treat an individual who has a mental health illness. And I want to look at the timeline here because I think that Mr. Davis' counsel has sort of jumbled everything together. But when you look at the timeline, Dr. Furst was going to see Mr. Davis. This is not a question. He testified, I was going to see him. I have to triage charts. I have to see the more urgent patients first. I'm only there 15 days a month. I mean, he was very responsive to Mr. Davis' complaints. So if you look at the timeline, he arrived on the 19th, February 19th. His first kite to Dr. Furst was on the 22nd. That first kite said nothing at all about being cut off, cold turkey, from his medications. It said nothing about being on amitriptyline, having his medications confiscated. It just said, Dr. Furst, I'm having some mental health symptoms. I need some help with my medications. Dr. Furst, in response to that, triaged the medical record. He looked at the official pharmacy database, which showed no active prescription for amitriptyline or any other psychotropic medication. And then he saw some inconsistencies in the record, including with Mr. Davis' reporting about his symptoms. He also saw that Mr. Davis had never been evaluated by any psychiatrist. And so he wanted Mr. Davis to undergo some psychological testing, and that was standard. And then Mr. Davis did that on the 11th, 10 days later. Now we're on March 11th. Mr. Davis didn't adequately participate in the testing. And then he kited Dr. Furst again on the 12th. And the 12th was the first time he told Dr. Furst, my medications were cut, cold turkey. Was this a reference to Dr. Zeiger? The psychological evaluation was Dr. Zeiger, yes. And Davis refused to assist in that? He didn't adequately participate. Her note is five pages long, and it contains multiple references to him not wanting to talk about things, him being irritable, not willing to participate in her development of whether he had an adequate history that would have made it appropriate to refer him for psychotropic medication management with Dr. Furst. And then on the 12th is when, after that appointment, Dr. Furst is first notified that Mr. Davis is saying he was cut off medications. Dr. Furst's response was the next day. He says, looking at your record, I don't see that. I don't see an active prescription. I don't see that you were on 100 milligrams, and you didn't want to participate with Dr. Zeiger. Then he kited, Mr. Davis kited Dr. Furst again the next day, and Dr. Furst responded to that kite. And the kite is important because it shows that Mr. Davis was complaining mostly about pain. And Dr. Furst referred him to the medical team, which is where the amitriptyline prescription had originated, and said, they'll be able to see you more quickly than me. If it helped with your pain, please go see them. And so just to briefly conclude, this is not a case about Dr. Furst choosing a medically unacceptable course in conscious disregard of an excessive risk to Mr. Davis. He did what he could to try and help this individual, and his claims do not fall under the Eighth Amendment. Thank you very much. I guess I'll start with Dr. Furst. The thing is, this gentleman came into a prison on mental health medications. They were confiscated. Dr. Furst knew it. The quote that was read by my colleague here admits that he knew it. He just claims that he thought it was a lower dosage. But the fact is, there are many, many cases that say it's deliberate indifference when you know medical order is being ignored. That's deliberate indifference. Beyond that, Dr. Furst has a policy that it doesn't matter the dosage. It's right there in his deposition and in his briefing. He doesn't care. You come in there, a felon on mental health meds, you get confiscated, and he sends you down the new patient pipeline. That's what Dr. Zeiger was. You know, I don't get to be really good buddies with a lot of my kind of clients, but I see their humanity. And I can tell you that when you take somebody and you put them in a brand-new prison and rip their meds, their mental health meds, and now they're off their meds, and now they're supposed to behave in a psych eval that's a malingering test, after trying everything to get back on their meds, they're probably not going to be all that cooperative. But that's all downstream of the problem. He's off his meds, and he has a standing active prescription. And, you know, my colleague here has mischaracterized the first kite. I hope the court will look at that. My client in that kite said, I have no meds, severe complications. And that was the February 22nd kite, three days after he got there. And he took six days for Dr. First to respond to that kite, but that's a question of, you know, the time frame of damages. That's not a question of subjective knowledge, particularly in light of the massive tranche of e-mails coming from his colleagues at the Olympic. Counsel, can I touch on a different issue before you run out of time? Absolutely. You've got a First Amendment retaliation claim, which requires a showing that some state actor took some adverse action to your client based upon your client's protected activity, protected conduct. What is the protected conduct? Is it everything he did, everything he said? Is it the comments to Hull about a mattress? So there are two. We're talking about Hull? Anybody. Tell me what the protected conduct is in a prison setting like this. Yeah, if you look at Sergeant Hull's deposition, he will tell you. I was surprised. He knew my client right off the bat because my client was constantly talking to him about a new sleeping mat from early August. So it's the request for a mattress? Yeah, constantly. Constantly pestering, I guess. Was just one request for a mattress constitute protected conduct? Or does it have to be repeated? It was many, many, many, many requests. And then kites and then grievances. So, yes, that's how Sergeant Hull remembered my client. And then Sergeant Hull fired off an email to a colleague stating that he really didn't like my client because of that. And I asked him, is there any other reason? The issue is what's your client's protected conduct that caused the retaliation. I want to focus on for a minute. What about the rough ride in the van? Was it him saying, take it easy? That constitutes protected conduct? Yeah. So anything he says to the bus drivers is protected conduct? Well, we know there are exceptions to protected speech. But that's certainly speaking to a state actor, saying, can you please not drive crazy. What's your authority for that? Well, it goes all the way back to Czaplinski, I would imagine, all Supreme Court precedent. There's very few carve-outs that say. Do you have anything specific for this kind of a context that says that that kind of a statement is protected conduct? Say, can you please be careful? Okay. Hmm. That's an interesting question. It's so obvious I hadn't thought in those terms. Well, most of the cases that come up are because someone has filed a formal complaint. Oh. And that's retaliated against by the officers. Here it's simply, take it easy, drive more carefully. That's protected conduct. The lack of formality of the speech. That's what we're asking. I apologize. That never even occurred to me. I haven't thought in those terms. But it's your position that it is? Absolutely, yes. So anything a prisoner says in prison to a guard is then protected conduct? No, no. There's a lot of carve-out. I mean, you know, fighting words, obscenity. Okay. But, yeah, I mean, you can't, if you're. . . So any complaint, any complaining about conditions, no matter how serious or insignificant, in your view, would be First Amendment activity? Yes, and I think that, you know, any prison guard can say shut up or go away or lock them in a different cell. You know, there's a lot, they have a lot of. . . And that's a retaliation under the First Amendment? No, no, that wouldn't be. I mean, if they're being disruptive, they can be moved. I mean, the penological interest always overshadows everything in there. And here we are 60 miles away in a van, so, yeah. So if I'm in a chow line and I don't like to mash potatoes and I say these potatoes are too lumpy, that could constitute protected conduct. Oh, yes. And lead to a retaliation claim? Absolutely, yes. Okay. And there's got to be the adverse action, of course, which would be, you know, directly related to that speech. It would be the moving factor. In any case, I guess I have two minutes. TOC made some points. They have this tactic of collapsing the timeline, making everybody look like they were Johnny on the spot with responding to the. . . Pardon me, I have a bad back, too. The job accommodation, that was 120 hours of lifting heavy stuff in a kitchen that's cooking for 300 guys. I mean, there's 100 days of Mr. Davis trying to get a decent sleeping mat, and, you know, these are not. . .
judges: BYBEE, FORREST, Gordon